51 CCPA

**Application of Jack W. HINMAN.**

**Patent Appeal No. 7089.**

United States Court of Customs
and Patent Appeals.

June 11, 1964.

George T. Johannesen, Kalamazoo, Mich. (Eugene O. Retter, Kalamazoo, Mich., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (J. E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

The issue here arises under 35 U.S.C. § 103. Its resolution requires a determination of whether the differences between the claimed subject matter and the prior art were such that the subject matter as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made. The problem in this case is complicated, however, by the highly specialized, technical nature of the claimed subject matter and by the failure of the specification so to disclose the subject matter that we might determine precisely what appellant has invented. A further complication arises from an apparent disagreement between the position taken by appellant's present attorney and that taken by appellant when the application was filed.

The application [1] in issue is entitled "Composition of Matter and Process." The invention is said to relate "to novel neomycin derivatives and to novel methods for making them," and further,

" * * * to novel methods of recovering neomycin derivatives from aqueous media containing compounds of the neomycin complex, i. e., neomycin and neamine, and to methods for converting said derivatives to neomycin and neamine in isolated and purified form."

Prior to appellant's invention neomycin was known to occur in the fermentation beers obtained by the cultivation of *Streptomyces fradiae*. While, technically, neomycin may occur in several forms, the specification states:

" * * * The term 'neomycin' as used in this application refers to either of the isomeric compounds or to mixtures of them, and the term

1. Serial No. 600,563, filed July 27, 1956.

'neomycin complex compound' refers to one of the neomycins as defined above, neamine, or mixtures thereof."

With the foregoing as general background, we pass to appellant's statement in the specification that:

"The novel derivatives of this invention are Schiff's bases which possess valuable inhibitory properties against pathogenic organisms and are hence useful in human and veterinary medicine. They also yield the parent neomycin or neamine compound upon treatment with acid, and are hence useful as intermediates in the preparation of purified neomycin, especially the recovery of neomycin compounds from fermentation beers or other such liquors, including the recovery of neamine from methanolysis or hydrolysis reaction media."

The specification also contains a general statement concerning how such assertedly novel derivatives are produced:

"Recovery from the beers or other aqueous liquors according to the invention is generally as follows. The liquor is made alkaline and at least five moles of an aromatic aldehyde is added, based on neomycin content, preferably with vigorous stirring. The resulting precipitate is the Schiff's base, which can be separated from the reaction mixture by filtration. The Schiff's base can be further purified, if desired, and used as such or it can be treated with acid to recover the neomycin compound which will be neomycin, i. e., Neomycin B, Neomycin C, or mixtures; or neamine, and will represent substantially the neomycin or neamine content of the original liquor. * * *"

Thus the invention concerns an intermediate product, which is a Schiff's base [2] formed by reaction of neomycin in a fermentation beer or other aqueous solution with an aromatic aldehyde. The end product, a salt of neomycin and an acid, was old prior to appellant's invention. The intermediate product, the neomycin Schiff's base, is described in the specification as being "characterized by biological activity comparable to that of neomycin or neamine products commercially available."

The claims on appeal (reproduced as an appendix to this opinion) are said to fall into four broad groups. The first deals with a process for recovering neomycin from fermentation brews which involves adjusting the pH of the beer, adding a specified aromatic aldehyde in order to precipitate the neomycin as a Schiff's base and then recovering the precipitated Schiff's base of neomycin from the fermentation beer (Cl. 24). When it is desired to recover the neomycin as an acid addition salt, the Schiff's base is treated with a mineral acid to regenerate the neomycin and the aromatic aldehyde, and the neomycin is recovered from the reaction mixture in the form of its acid addition salt (Cl. 25).

In the second group, appellant claims the neomycin Schiff's bases. Claims 1 and 32 define a neomycin Schiff's base in which the aldehyde may be selected from a class defined by a general formula. Claims 2 and 33–37 define a neomycin

---

2. Any of a series of bases, formed usually by reaction of an aldehyde with a primary amine, as aniline, with elimination of water. Schiff's bases are useful reagents in that upon hydrolysis they are split into the original aldehyde and amine. See Richter, Textbook of Organic Chemistry 425 (1952):

"The reaction of primary arylamines and aldehydes leads to a type compound referred to as a Schiff's base or azomethine, substances which contain the structure —CH=N—. Acetaldehyde and aniline react to form ethylideneaniline.

$$CH_3-\underset{\underset{H}{|}}{C}=O + H_2N-C_6H_5 \longrightarrow CH_3-CH=N-C_6H_5 + H_2O"$$

Schiff's base in which the aldehyde is specified. [E. g., salicylaldehyde (Cl. 2); benzaldehyde (Cl. 34).]

The third group of claims defines the process for making the neomycin Schiff's bases (rather than recovering the neomycin from the fermentation brew). These are claims 10 and 14.

The fourth group of claims is characterized by appellant as defining a process for making neomycin salts. These are claims 13 and 15.

The examiner rejected all the claims on the basis of a single reference, Janot.[3] Janot is concerned with the antibiotic framycetin, which is derived from a strain of bacteria identified as *Streptomyces T 59* and is indicated as having a spectrum with points in common with the antibiotic spectra of streptomycin and neomycin. The article discusses the hydrolysis of framycetin and reports on studies of the hydrolysis products which are identified as fractions A, B, C and D. Derivatives of fraction A, including the crystallized salicylidene thereof, are compared with the corresponding derivatives of neamine, and the molecular weight of the salicylidene is found to compare with the tetra-salicylidene of neamine, from which it is concluded "that fraction A is identical with neamine." The article indicates that the salicylidene derivative was prepared by reacting the base fraction A dissolved in water with salicylaldehyde to form a thick yellow precipitate which was then extracted and recrystallized from hot methyl alcohol in the form of brilliant yellow flakes. Analysis of the product indicated a molecular weight and percentage atomic composition corresponding to the tetra-salicylidene of neamine and that the amine base fraction A has the empirical formula $C_{12}H_{26}O_6N_4$, which is that of neamine.

In summary, the Janot reference discloses a treatment of *neamine* which is comparable to appellant's process for producing *neomycin* Schiff's bases. The Janot process forms a Schiff's base of neamine in an aqueous solution as an intermediate product, precipitates that base, and crystallizes a salt of neamine as the end product. Thus the principal difference is that Janot is concerned with neamine rather than neomycin. This difference loses much of its significance, however, when the following excerpt from appellant's specification is considered:

"* * * The product is further characterized by low water solubility and solubility in acetone and low molecular weight alcohols. On treating the novel Schiff's base of neomycin * * * with a strong mineral acid, e. g., sulfuric acid, hydrochloric acid, hydrobromic acid, hydriodic acid, phosphoric acid, and the like, the corresponding acid salt of neomycin * * * is obtained."

In each instance, the omitted words (indicated by asterisks) are "or neamine." Thus, when the application was filed, it appears to have been appellant's position that the invention pertained equally to neomycin or neamine.[4] It is only after neamine compounds are shown to be old by the Janot reference that we find appellant shifting to the position here asserted, i. e., that:

"* * * there is no such art recognized similarity between neamine and neomycin that it can be properly held that it would have been obvious to one skilled in the art at the time the invention was made that neomycin could be substituted for neamine in the Janot process. The general principle of law that the application of an old process to a new and analogous material is not invention, or more aptly under the new Code 'is not unobvious', is inapposite because it has not been established by the Patent Office that neo-

3. Soc. Chimique de France, Bulletin T. 21, pp. 1458–63 (Nov.–Dec.1954).

4. The specification is replete with dual references to neomycin *and neamine*. See, for example, the excerpts from the specification quoted earlier in this opinion.

mycin is an analogous compound to neamine. The contrary in fact is established by the great difference in structural characteristics and the difference in biological characteristics between neomycin and neamine. \* \* \*"

We see no merit in this position. The application establishes that appellant recognized the similarity of neomycin and neamine with respect to: 1) their ability to form Schiff's bases in aqueous solutions, 2) the low water solubility of such bases, 3) their solubility in acetone or low molecular weight alcohols, and 4) treating the Schiff's base with a strong mineral acid to form the corresponding acid salt.

While the record before us does not contain the office actions in which the Janot reference was first cited, it appears that, despite the arguments advanced in certain of the remarks appended to several amendments which are reproduced in the record, the examiner in the final action of September 26, 1960, considered at least partially the above quoted portions of the specification when he stated:

"Claims 1, 2 and 32 are again rejected as fully met by Janot for the reasons fully of record. These claims are drawn to a neomycin Schiff's base and as previously pointed out the instant disclosure appears to employ the term neomycin as including neamine. Note pages 1–4 of the disclosure. Applicant urged and submits exhibits seeking to show that the term neomycin does not include neamine. The fact remains that the instant disclosure appears to employ the term neomycin as including neamine. \* \* \*

"Claims 10, 13–15, 24, 25 and 33–37 are again rejected as unpatentable over Janot for the reasons fully of record. It is again pointed out that no invention is involved in making the Schiff's base with neomycin in view of the Janot teaching of employing neamine. The specific reac-

tion conditions etc. as recited in some of the claims are obvious to one skilled in the art."

It is appellant's contention, as stated in his brief, that:

"He has provided a novel process for making his novel neomycin Schiff's bases. This process differs from that of Janot both in being applied to a non-analogous material and involving different process conditions."

Thus appellant's position appears to be 1) that Janot's treatment of neamine produces a product which is neither chemically nor biologically closely related to neomycin and 2) that Janot does not disclose the recovery of neamine from a fermentation beer or any suggestion that it could be recovered by treating such a beer with salicylaldehyde. We shall consider these positions in the order stated.

In affirming the examiner's rejection, the board noted that the specification and claims as originally filed in the case at bar applied appellant's process to both neamine and neomycin. After referring to this statement, appellant's brief asserts:

" \* \* \* This statement on its face is reversible error in view of In re Ruff et al., [256 F.2d 590] 45 CCPA (Patents) 1037, 18 U.S.P.Q. 340. In view of In re Ruff et al. appellant is entitled to have his invention appraised by what is taught in the prior art, not what is found in his own disclosure."

As we view the matter, appellant's position is not warranted by the Ruff decision. The facts here bring this case within the decision of In re McKee, 75 F.2d 635, 22 CCPA 1010. Here, as in the Ruff case:

"It will be illuminating, perhaps, to contrast In re McKee with the present case. The invention there claimed was a method of slicing meat by first freezing it. The application *defined* 'slicing' as including sub-

dividing 'in whatever manner may be employed, as for instance, by means of a knife, chopping tool, or saw.' The thus defined term 'slicing' was employed in the claims and the applicant himself had determined what it was to mean. The first thing to note is that the court fully agreed with the board that the claims, so written, *were fully met by the references* because the applicant had so broadened the meaning of 'slicing' as to read on chopping and sawing, which the references showed. When it was argued that claims specifically limited to the use of a knife blade cutter should be allowed this court said,

" 'The difficulty with this position is that the appellant, by his definition of the meaning of "slicing," * * * considers a knife, a chopping tool, and a saw as equivalents. If he so considers and treats them, then he can claim no patentable distinction between them upon this application.' "

The problem in the present case is to get at the technical facts. As stated in Ruff:

" * * * When a man, or a witness, or an applicant for a patent, without knowing how it is going to affect his interest, makes a statement which he later attempts to deny when he has found it is against his interest, he will not be believed unless he produces convincing proof of his later assertion."

 Here, arrayed against the statements of the examiner and the board and the disclosures of appellant in his application, we have only the unsupported statements of appellant's counsel in amendments and in the brief herein that neomycin and neamine are not so related chemically and biologically that a prior art teaching of forming a Schiff's base of neamine would make obvious to one of ordinary skill in this art the formation of a Schiff's base of neomycin.

We do not consider such statement to constitute the "convincing proof" to which reference is made in the Ruff decision. Indeed, we think the facts in the present case warrant us in here restating the following portion of the Ruff decision:

"The following cases might be cited for the proposition that an applicant's own showing of equivalence *may* be used as the basis for rejecting a claim, and the list is but exemplary. In re McKee, supra, the meat slicing case; In re Hartung, 121 F.2d 529, 28 C.C.P.A., Patents, 1364, disclosing a homologous series of catechols having 4 to 8 carbon atoms where the six carbon atom member was in the prior art; In re Lobdell, 167 F.2d 634, 35 C.C.P.A., Patents, 1091, showing brazing as the known equivalent of silver soldering to hold the cutting tips in tool shanks; In re Switzer [et al.], 166 F.2d 827, 35 C.C.P.A., Patents, 1013, carbon black and titanium dioxide as known equivalent inert fillers or pigments in a coating; In re Withington, 104 F.2d 192, 26 C.C.P.A., Patents, 1290, intaglio as the equivalent of cameo brand markings on a wooden handle; In re Lindberg, 194 F.2d 732, 39 C.C.P.A., Patents, 866, a hydraulic drive for the agitator in a tank versus a chain and pulley drive; In re Stewart, 222 F.2d 747, 42 C.C.P.A., Patents, 937, removing a film with a swab or with a spray of air and water. Some of these cases were cited by the board to support the Borcherdt doctrine and others were cited in the Borcherdt case [197 F.2d 550, 39 C.C.P.A. 1045] to support its dictum that the applicant's own disclosure of equivalence might be enough. There are many others, some more complex in their facts, but the principle running through these cases is basically the same in each. Even though a reference is not produced to show an equivalence *which is in fact art-recognized or obvious*, the applicant's

own express recognition of it may be a sufficient basis on which to refute his subsequent argument that equivalence does not exist. We see nothing wrong with the 'Borcherdt doctrine' if it is kept within this limitation. \* \* \* "

In the present case, appellant's specification refers to neomycin and neamine as being known, commercially available substances at the time the alleged invention was made. The examiner stated that the fermentation beer, in addition to two forms of neomycin, also contains neamine; the following statement in appellant's brief bears this out:

"Neomycin is a product of fermentation. When the micro-organism, *Streptomyces fradiae*, is cultivated under suitable conditions, as is well known in the art, the fermentation beer contains neomycin B and neomycin C. Neamine is also sometimes formed in fermentation beers concomitantly with neomycin."

In addition, the specification contains many statements, some of which we have quoted earlier in this opinion, which indicate an extremely close relationship between neomycin and neamine.

Thus, we are inclined to view with suspicion appellant's present contention that neamine and neomycin are non-analogous materials. Appellant has made no showing of fact which rebuts the contrary statements made in his specification and the contrary findings of the examiner. We think these statements disclose such a close relationship between neomycin and neamine that it would have been obvious to one of ordinary skill in the art that the two substances were equivalent materials with respect to Schiff's bases and salts thereof, especially since both appellant's specification and Janot involve the formation of a Schiff's base formed by reaction of an aromatic aldehyde with a compound containing a primary amino group.

With respect to recovery of neomycin from fermentation beers, it would seem to have been obvious to apply the techniques Janot used with neamine, which formed the unsoluble Schiff's base precipitate. Therefore, appealed process claims 24 and 25, drawn to the method of recovering neomycin from a fermentation beer containing neomycin in aqueous solution, cover but an obvious use of the Janot process. Janot teaches that the analogous substance neamine forms an *insoluble* Schiff's base precipitate when reacted with an aromatic aldehyde in an aqueous reaction medium. This clearly suggests the claimed method for recovering the analogous neomycin from any aqueous solution or medium in which it occurs, including the claimed fermentation beer. Consequently, the examiner and the board properly concluded that claims 24 and 25 would be obvious to one skilled in the art in view of the teachings in the Janot article.

In contending for the patentability of the process claims over the prior art, appellant states that he is unable "to discern anything in the disclosure of the reference which is relevant to the recovery of neomycin from a fermentation beer." Since Janot refers to crystalline substances, appellant inquires how one could obtain crystalline neomycin since is it a non-crystalline material, and adds that there would be no way of knowing from Janot whether salicylidene neomycin would precipitate. He urges further that there is no suggestion in Janot of adding salicylaldehyde directly to the fermentation beer at a pH of 8.5 to 12; and that Janot employs a highly concentrated solution as compared with a fermentation beer. He also challenges and refuses to admit the board's statement that the hydrolysis of a Schiff's base is well known in the art and contends that even if this is true, the claimed combination is not obvious. However, for the reasons detailed at length above, insofar as this record establishes, neamine and neomycin are clearly analogous and closely related materials. Since the Janot article teaches that a Schiff's base of neamine is insoluble in an aqueous medium, it would seem obvious that a

Schiff's base of neomycin would also be insoluble in an aqueous medium—including that of a fermentation beer—and that neomycin could readily be precipitated therefrom as a Schiff's base.

The appellant refers to the court's recent decision in In re Papesch, 315 F. 2d 381, 50 CCPA 1084; in an "Addendum" to his brief, as holding that the question of obviousness cannot be determined without considering both the structure and the properties of a chemical compound. He contends, therefore, that the rejection of the claimed compounds was error since the Patent Office allegedly ignored their properties and "based its holding exclusively on structural and process considerations." We do not agree with appellant's statement of the Patent Office position. Such a statement ignores what seems to be the fact—that the prior art Janot process and product were in effect included in appellant's disclosure. Thus it was unnecessary to predicate the decisions below on the technical aspects of "structural and process considerations." It is this fact which readily distinguishes Papesch from the case at bar. Papesch involved claimed compounds which were rejected on the bare disclosure of a prior art homologue, and this was done in the presence of an affidavit showing comparative testing of the prior art compound and the claimed compounds. The facts in the present case are entirely different. There is no comparative showing in the record, and the involved application, if it means anything, must be said to concede that there are substantially no biological differences between the claimed neomycin Schiff's bases and the known neomycin of the prior art. As appellant points out in his specification:

"* * * The Schiff's base product obtained in this manner is characterized by biological activity comparable to that of neomycin or neamine products commercially available. * * *"

Thus appellant has acknowledged that neomycin retains its biological properties as a Schiff's base, and the record is devoid of any factual showing to the contrary with respect to neamine.

While there are recitals in certain of the appealed claims of specific reactants and specific process conditions not found in Janot, it was the position of the examiner, affirmed by the board, that such reactants and process conditions would involve no unexpected result. Thus, as to claims 33–37, we agree with the board that:

"* * * we find nothing unobvious for one skilled in the art in that different compounds are formed (as to the tetra- and hexa- compounds) according to the aldehyde reacted."

We also agree with the board:

"In order to form the aldehyde reaction product of neomycin, it would appear obvious for one skilled in the art to react the free base rather than the salt with the aldehyde. As appellant points out, the pH range of appellant's claims 10, 13, 14, 15, 24 and 25 embraces that of free neomycin. We agree with the Examiner that the proportion of aldehyde would be within the skill of the art. In re Swain et al., 33 CCPA 1250, 593 O.G. 3, 156 F.(2d) 239, 70 USPQ 412."

Appellant has urged the unobviousness of regenerating the neomycin from the Schiff's base and recovering neomycin from the reaction mixture in the form of its acid addition salt as claimed in claims 13, 15 and 31. As pointed out by the board:

"* * * It is well known in the art to hydrolyze a Schiff's base with acid to the carbonyl compound and the amine, thus forming the acid addition salt of the amine, in this case of the neomycin. Acid addition salts of neomycin are well known in the art. Appellant, for example, acknowledges neomycin sulfate."

For the foregoing reasons we affirm the rejection of all the appealed claims.

Affirmed.

## APPENDIX

### REJECTED CLAIMS

1. A neomycin Schiff's base, of an aldehyde having the following formula:

wherein each of R and R' is a member of the group consisting of hydrogen, alkyl, alkoxy, hydroxy, halogen, and nitro groups.

2. A neomycin Schiff's base of salicylaldehyde.

10. A process which comprises reacting in an inert reaction medium neomycin at a pH of 8.5 to twelve with between five and ten molar equivalents of an aromatic aldehyde of the formula:

wherein each of R and R' is a member of the group consisting of hydrogen, alkyl, alkoxy, hydroxy, halogen, and nitro and separating the resulting Schiff's base from the reaction mixture.

13. A process which comprises reacting in inert reaction medium neomycin at a pH of 8.5 to twelve with between five and ten molar equivalents of an aromatic aldehyde of the formula:

wherein each of R and R' is a member of the group consisting of hydrogen, alkyl, alkoxy, hydroxy, halogen, and nitro and separating the resulting Schiff's base from the reaction mixture, dissolving said Schiff's base in an inert organic reaction medium, acidifying the resulting solution and recovering the acid salt of neomycin from the said organic reaction medium.

14. The method of preparing a novel chemical compound which comprises reacting neomycin in an inert reaction medium at a pH within the range of 8.5 to twelve with five to ten molar equivalents of salicylaldehyde to form a salicylidene neomycin as a precipitate and separating said precipitate from the reaction medium.

15. The method according to claim 14 wherein the precipitated salicylidene neomycin Schiff's base is subsequently treated with a mineral acid to form the corresponding acid salt of neomycin.

24. The method of recovering neomycin from a fermentation beer containing neomycin in aqueous solution which comprises adding to said beer at a pH between 8.5 and 12, a sufficient quantity of an aromatic aldehyde of the formula:

wherein each of R and R′ is a member of the group consisting of hydrogen, alkyl, alkoxy, hydroxy, halogen, and nitro, to precipitate the neomycin as a Schiff's base and recovering the precipitated Schiff's base of neomycin from said beer.

25. A method of recovering neomycin from a fermentation beer containing neomycin in aqueous solution which comprises adding to said beer, at a pH between 8.5 and 12, a sufficient quantity of an aromatic aldehyde having the formula:

wherein each of R and R′ is a member of the group consisting of hydrogen, alkyl, alkoxy, hydroxy, halogen, and nitro, to precipitate the neomycin as a Schiff's base, reacting the thus obtained Schiff's base with a mineral acid to regenerate the neomycin and the aromatic aldehyde, and recovering neomycin from the reaction medium in the form of its acid addition salt.

32. A neomycin Schiff's base having the formula:

wherein $R''(NH_2)_6$ represents neomycin, n is an integer from 4 to 6, and each

of R and R′ is a member of the group consisting of hydrogen, alkyl, alkoxy, hydroxy, halogen, and nitro groups.

33. Hexasalicylidene neomycin.

34. Hexabenzylidene neomycin.

35. Tetra-m-nitrobenzylidene neomycin.

36. Para-methoxybenzylidene neomycin.

37. Para-nitrobenzylidene neomycin.